**UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT**

In re:

    **Winter Manufacturing, Inc.**                     **Chapter 7 Case**
           **Debtor.**                                    **# 09-10676**

Filed & Entered
On Docket
September 3, 2011

**ORDER
OVERRULING OBJECTIONS TO MOTION FOR EARLY DISBURSEMENT TO PRE-PETITION EMPLOYEES
BASED UPON THE DOCTRINE OF EQUITABLE SUBORDINATION**

    Winter Manufacturing, Inc. (the "Debtor") filed a voluntary chapter 7 petition on June 10, 2009. On July 20, 2010, John L. Kennedy, Mark R. Brosseau, F. Douglas Anderson, James Kirschner, David Gauthier, Teresa Winter, and Lynn Bailey (together the "Claimants"), filed a motion requesting allowance and early payment of the claims they filed in this instant case for pre-petition wages and benefits (the "Motion"). Christine and Michael Spangler (the "Spanglers"), and Elizabeth Callahan and Daniel Howard (the "Howards") filed objections to the Motion focused on the doctrine of equitable subordination (doc. ## 87, 89, 102, 103).[1] The Court held an evidentiary hearing on the matter on March 31, 2011, and granted the Howards' request to be excused from appearing at trial and allowed to rest upon the papers and the evidence elicited at trial (doc. # 124). The parties filed proposed findings of fact and conclusions of law (doc. ## 131, 133, 140; see also doc. ## 141, 142), and the Court took the matter under advisement on May 18, 2011.

    The Bankruptcy Code provides, in relevant part, that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

    (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

    (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). "The doctrine of equitable subordination is remedial, and the goal 'is to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" Citicorp Venture Capital Ltd. V. Comm. of Creditors

---

[1] The Trustee also filed an objection to the motion (doc. ## 86, 101), which the Court will address separately. The Court notes that the Trustee's initial objection raised the possibility of equitable subordination (see doc. # 86), but that the Trustee has since abandoned this argument (see doc. # 133, pp. 9–10, ¶ 50, p. 19, ¶ 15).

Holding Unsecured Claims, 323 F.3d 228, 233 (3d Cir. 2003) (citation omitted). In order for the Court to equitably subordinate a claim, the following conditions must be met:

> (i) The claimant in question must have engaged in some type of inequitable conduct.
>
> (ii) The misconduct must have resulted in injury to a creditor of the bankrupt or conferred an unfair advantage to the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

In re Mayo, 112 B.R. 607, 650 (Bankr. D. Vt. 1990) (Conrad, J.). The "inequitable conduct" in the first criteria has been described as:

> [c]onduct which may be lawful, yet shocks one's good conscience. It means inter alia a secret or open fraud; lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable unjust, unfair, close, or double dealing or foul conduct.

Id. The movant bears the burden of establishing that equitable subordination is warranted. See In re Kelton Motors, Inc., 121 B.R 166, 190 (Bankr. D. Vt. 1990) (Marro, J.).

The Howards objected to the Motion on the basis of equitable subordination (doc. ## 89, 103),[2] arguing that to allow the Claimants to be paid from the estate at all was to allow them to profit from misconduct. The Howards allege the following in support of their equitable subordination argument:

1. the Claimants are insiders of the Debtor seeking to gain payments from settlement proceeds that are not part of the bankruptcy estate;

2. the proceeds are only available because the Debtor passed defective chemicals on to end-user creditors in the form of defective insulation paneling;

3. the end-user creditors, including the Howards, were severely injured by the Debtor's defective panels;

4. in many instances the Debtor, via the Claimants, either provided the defective panels to consumers knowing of the defects, or were in a position that they should have known of the defects;

5. the Claimants kept the Debtor severely undercapitalized; and

6. the Claimants inappropriately used funds of the Debtor for personal use.

---

[2] The Howards also joined in the Trustee's objection (doc. # 103, ¶ 2), and further objected to the motion on the basis that the claims lacked supporting documentation, were not entitled to priority status, and were far in excess of the priority claim allowed (doc. # 89), which arguments the Court will address separately. Although the Howards objected to the motion on the basis that the claims may be for wages earned over 180 days before the petition date (doc. # 89), subsequently specifying that they objected to the claims of Lynn Bailey, James Kirschner, David Gauthier, and F. Douglas Anderson (doc. # 103, ¶ 1), these four Claimants filed amended proofs of claim (claim ## 20-2, 24-2, 46-2, 62-2) showing that the compensation and vacation benefits sought fell within the 180-day period of § 507. Accordingly, to the extent this argument has not been abandoned, this portion of the Howards' objection to the motion is overruled.

2

(doc. # 89, ¶¶ 7–10). Based upon these assertions, the Howards argue that equitable subordination of the Claimants' claims to the claims of the creditors who were harmed by the Debtor's use of defective chemicals is warranted (doc. # 89, ¶ 11). However, there is no evidence in the record to support the Howards' allegations that the Claimants either undercapitalized the Debtor or inappropriately used the Debtor's funds for personal use. Furthermore, although the Howards appear to allege that the Claimants knew or should have known of the defects in the panels, there is no evidence in the record to support this allegation.

Mr. Gauthier credibly testified at the evidentiary hearing to the following facts. The Debtor manufactured insulated building panels, and the Debtor's financial troubles began in 2003 when the EPA mandated that the Debtor change the chemical formula for its urethane panels. The Debtor began using a new formulation based on the recommendation of BASF, a company with which it was working, and the formula turned out to be faulty and caused the panels to shrink. As a result of this, a number of panels shipped out to customers became dimensionally unstable and customers began to complain. Neither the Debtor's insurance provider nor the chemical company would cover the complaints, and the Debtor did its best to take care of the claims, paying out over $800,000.00 in warranty claims from 2005 to 2008. Mr. Gauthier was involved in a lawsuit against BASF, the supplier that the Debtor maintained supplied it with faulty chemicals, and the BASF litigation settled in March 2010. The Court takes judicial notice of the motion to approve the settlement between the Debtor and BASF in the gross amount of $500,000.00 filed on April 22, 2010 (doc. # 77), and the order approving it entered on June 22, 2010 (doc. # 79).

None of the evidence presented at the four-hour hearing supports the allegation that the Claimants knew or should have known that the panels were defective, or that the Claimants would be unjustly enriched by a distribution from the estate to pay their claims. The Howards have failed to meet their burden of establishing that equitable subordination is warranted. See In re Kelton Motors, Inc., 121 B.R at 190. Accordingly, the Howards' objection to the Motion based upon the doctrine of equitable subordination is overruled.

The Spanglers initially objected to the Motion as to David Gauthier and Teresa Winter until they could further investigate "possible collusion and misuse of corporate funds" (doc. # 87). In their supplemental objection, the Spanglers argued that there was a possible preferential sale of the Debtor and its assets, and that a scheme was "concocted" to avoid paying a judgment owed to the Spanglers (doc. # 102).[3] At the March 31st evidentiary hearing, Thomas C. Bixby, Esq., appearing on behalf of the

---

[3] The Spanglers also argued in their supplemental objection that Mr. Gauthier's claim is beyond the 180 days allowable for such claims (see doc. # 102). On December 27, 2010, Mr. Gauthier filed an amended proof of claim (claim # 46-2) showing that the compensation and vacation benefits sought fell within the 180-day period of § 507. Accordingly, to the extent this argument

3

Spanglers, stated in his opening remarks that the only objection the Spanglers were asserting was as to Mr. Gauthier's claim, and they no longer objected to any of the other Claimants' claims. Mr. Bixby also stated that the basis of the Spanglers' objection to Mr. Gauthier's claim and request for early distribution was the doctrine of equitable subordination.[4]

It is unclear exactly what factual basis the Spanglers' are relying upon in their equitable subordination objection to Mr. Gauthier's claim. The papers include the following wide-ranging and rather disconnected allegations:

1. in 2001 and 2005 the Debtor was valued at over $900,000.00;
2. 74 Glen Orne Drive Realty Trust (the "Realty Trust") owned the real property and building at which the Debtor operated;
3. Mr. Gauthier became president of the Debtor in late 2000 or early 2001 and made all financial decisions from 2000 or 2001 forward;
4. the Debtor failed to meet corporate law obligations in that it failed to hold formal corporate meetings;
5. Mr. Gauthier allegedly handled the operations of the company and loans with TD Bank;
6. in order to obtain a loan for the debtor, Ms. Winter pledged personal assets as well as assets of the Realty Trust, starting in 2002;
7. there was a revolving line of credit with TD Bank for the benefit of the Debtor, which the assets of the Realty Trust cross-collateralized;
8. on December 29, 2004, the Debtor took a loan in its own name, in the amount of $700,000.00;
9. Mr. Gauthier did not recall any specific corporate resolutions authorizing this $700,000.00 loan;
10. the specific purpose for the $700,000.00 loan was a cash out transaction regarding Ms. Winter's divorce settlement, and the loan proceeds were paid over to Ms. Winter for her personal use;
11. in May 2009, at the time TD Bank seized the assets of the Debtor, there was an outstanding loan in the amount of $300,000.00;
12. there also existed a Realty Trust loan in excess of $600,000.00 dating back to late 2008;
13. Mr. Gauthier could not explain why TD Bank did not foreclose on the real property since the Realty Trust real property was also collateral for the Debtor's loans;
14. TD Bank continually made loans to the Debtor despite the fact that in 2007 the Debtor was losing

---

has not been abandoned, this portion of the Spanglers' objection to the motion is overruled.

[4] Mr. Bixby also indicated in his opening statement that the Spanglers objected to the motion as to Mr. Gauthier on the basis that the business was not operating during the relevant time period, which argument the Court will address separately.

money;

15. at the time of the stipulation of judgment with the Spanglers, the Debtor was close to being bankrupt;

16. in January 2009, Mr. Gauthier allegedly handled the negotiations of the Spanglers claim to pay the judgment;

17. Mr. Gauthier was involved in discussions with Mehdi Bendimerad regarding a possible sale of the Debtor to World Panel prior to the bankruptcy filing;

18. On February 12, 2009, Mr. Bendimerad sent a letter of intent to purchase the Debtor;

19. Mr. Bendimerad's letter of intent described an offer to purchase the Debtor "lock, stock, and barrel" with the exception of liabilities;

20. Mr. Bendimerad was to receive an offset of $68,000.00 for a debt owed to him by the Debtor;

21. Mr. Gauthier is unaware of whether any consideration for $68,000.00 owed to Mr. Bendimerad was given for the transfer of assets of the Debtor to World Panel;

22. the sale of the Debtor's assets to World Panel included all the Debtor's equipment, and as such World Panel was able to carry on production of the now-defunct Debtor;

23. the transfer of assets included the trade name "Winter Panel";

24. Mr. Gauthier had an expectation that TD Bank would maximize the value of the Debtor's assets;

25. the appraisal report obtained by TD Bank was done with the intent that the Debtor's assets would be sold in pieces and not to an end user as ultimately occurred when World Panel purchased the Debtor as an operating entity;

26. there was a seamless transition between employees of the Debtor and World Panel as all employees were retained by World Panel;

27. World Panel was operating out of 74 Glenn Orne Drive, the business operations of the Debtor prior to the sale;

28. on June 4, 2009, the Debtor entered into a subordination agreement with World Panel, though Mr. Gauthier had no recollection of such subordination agreement;

29. Mr. Gauthier is currently employed as president of World Panel.

(doc. ## 87, 102). From this, it is difficult to discern precisely what the Spanglers are arguing. To the extent that the Spanglers are arguing that Mr. Gauthier's claim should be equitably subordinated because he was unjustly enriched on the basis of collusion or misuse of funds of the Debtor (see doc. # 87), there is no evidence in the record to support this allegation. Similarly, to the extent the Spanglers are arguing that the Debtor went out of business and transferred its assets to TD Bank, which TD Bank subsequently sold

5

to World Panel, as part of a scheme concocted by Mr. Gauthier to avoid paying a judgment to the Spanglers (see doc. # 102), there is nothing in the record to support this allegation. The record reflects that the Debtor executed an agreement for voluntary surrender of collateral with TD Bank on May 8, 2009 (see Ex. 12). On June 4, 2009, TD Bank and World Panel entered into a purchase and sale agreement as to the Debtor's property interests (see Ex. 16). None of the evidence presented at the hearing supports the allegation that these agreements were part of a scheme by Mr. Gauthier to avoid paying a judgment to the Spanglers. The Spanglers also allege that Mr. Bendimerad sent a letter of intent to purchase the Debtor, and appear to argue that this is further evidence of such a scheme by Mr. Gauthier to avoid paying a judgment to the Spanglers. However, the Spanglers did not elicit any testimony, and no exhibits were admitted, in support of this allegation.[5] There is nothing in the record to link the purported letter of intent to sell the Debtor's operations to Mr. Bendimerad with the purported scheme to deprive the Spanglers of collection on their judgment. Thus, there is no way to connect this allegation with the Spanglers' argument that Mr. Gauthier's claim should be equitably subordinated.

At the evidentiary hearing, the Spanglers made four additional arguments in support of their objection based upon equitable subordination. First, the Spanglers argued that the Debtor was undercapitalized. However, there is no evidence in the record to support this allegation.

Second, the Spanglers argued that Mr. Gauthier intended to deceive the Spanglers because, at the time of the Spanglers' judgment, the Debtor was bankrupt. Again, there is no evidence in the record to support this allegation.[6]

Third, the Spanglers argued that Mr. Gauthier was really working for the new corporation, World Panel, which was set up at the same location as the Debtor's business three days before the sale. Mr. Gauthier testified that after the Debtor executed the surrender agreement with TD Bank on May 8, 2009, he continued to go to work at the same building and use the same equipment, notwithstanding the surrender of assets to TD Bank. There is an outstanding question as to whether, during May 2009, the Claimants were working for TD Bank or for the Debtor. The Court will address this question in a separate order. However, Mr. Gauthier could not have been working for World Panel at this time, because, according to the record in this case, World Panel had no interest in the entity prior to the June 4, 2009

---

[5] The Spanglers' proposed exhibit list included 28 proposed exhibits (see doc. # 123, p. 6). However, the Court denied admission of the 28 exhibits at trial based on the failure of counsel for the Spanglers to timely produce the documents to the Trustee and counsel for F. Douglas Anderson, James Kirschner, David Gauthier, and Lynn Bailey. The Spanglers' Exhibit 2, a copy of a printout from the Vermont Secretary of State website, was subsequently admitted into evidence upon consent of the other parties.

[6] Moreover, this allegation raises the question of when the Spanglers learned of the Debtor's financial condition and why they accepted this settlement if they had reason to believe that the judgment was not likely to be enforceable.

purchase and sale agreement of the Debtor's property executed by TD Bank and World Panel.

Finally, the Spanglers were emphatic in wanting the Court to be aware that the Vermont Secretary of State records reflected that the Debtor lost its authority to operate in Vermont as of April 24, 2009, though the Spanglers did not articulate how this fact would support their equitable subordination argument. However, the Court need not address this issue, since the exhibit admitted in support of the Spanglers' argument is a copy of a printout from the Vermont Secretary of State website indicating that World Panel is of "active" status as of June 1, 2009 (see Spanglers' Ex. 2), and does not indicate anything regarding the status of the Debtor. Further, the Spanglers' efforts to elicit testimony on this point at the evidentiary hearing were fruitless.[7]

The Court finds that the Spanglers have failed to meet their burden of establishing that equitable subordination is warranted. See In re Kelton Motors, Inc., 121 B.R at 190. Accordingly, the Spanglers' objection to the Motion based upon the doctrine of equitable subordination is overruled.

For the reasons set forth above, IT IS HEREBY ORDERED that the objections of both the Howards and the Spanglers based upon the doctrine of equitable subordination are OVERRULED.

IT IS FURTHER ORDERED that the objections of both the Howards and the Spanglers on the basis that the claims are for compensation outside of the 180-day period of § 507(a)(4) are OVERRULED.

IT IS FURTHER ORDERED that the following remaining objections will be addressed by separate order:

1.  the Trustee's objection to the Motion (doc. # 86, 101), including the issue of whether, during May 2009, the Claimants were working for TD Bank or for the Debtor;

2.  the Howards' joinder in the Trustee's objection (doc. # 103, ¶ 2);

3.  the Spanglers' objection to the Motion with respect to Mr. Gauthier on the basis that the Debtor's business was not operating during the relevant time period; and

4.  the Howards' objection to the Motion on the basis that the claims lacked supporting documentation, were not entitled to priority status, and were far in excess of the priority claim allowed (doc. # 89).

SO ORDERED.

_____
September 2, 2011                                     Colleen A. Brown
Burlington, Vermont                                   United States Bankruptcy Judge

---

[7] The March 31st evidentiary hearing in this matter lasted approximately four hours, and the Court heard testimony from five witnesses. Except in the minimal ways identified above, the Spanglers did not elicit any testimony that supported their equitable subordination arguments, and succeeded in having only one exhibit admitted.

7